**IN THE UNITED STATES
DISTRICT COURT FOR
THE WESTERN
DISTRICT OF VIRGINIA
ROANOKE DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | Case No: 4:21-CR 00015 |
| | ) | |
| **PIERRE RASHAD PRESTON,** | ) | |
| Defendant. | ) | |

## <u>REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION</u>

None of the crimes for which Mr. Preston was convicted carry a sentence of death and yet, that is precisely what Mr. Preston could be facing if he is not removed from the BOP.

The Government dismisses Mr. Preston's concerns and states he has failed to meet his burden to establish extraordinary and compelling reasons for release because "a mere disagreement with the medical care being provided is not a basis for compassionate release." *United States v. Kellan*, 2024 WL 477023, at *4 (W.D. Va. Feb. 7, 2024). This is not mere disagreement with a course of treatment, Mr. Preston is receiving is inadequate and the BOP, perhaps despite its best intentions, is grossly mismanaging Mr. Preston's care. The "need to obtain adequate treatment for [a] disease when BoP appears unable to provide it without court oversight is a compelling reason for a sentence reduction." *United States v. Beck*, 425 F. Supp. 3d 573, 581-82 (M.D.N.C. 2019).

### I.    Legal Standard

As discussed in both the government and defense briefs, U.S.S.G. §

1

1B1.13(b)(1)(C) directly contemplates a defendant's medical condition as extraordinary and compelling if it "requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." While the U.S.S.G. directly contemplate such inadequate care as an extraordinary and compelling reason for compassionate release, the Court is still empowered to consider any reason a defendant may raise, even if such reasons do not neatly fit into the strict scriptures of the guidelines' box. *United States v. Evins*, 2025 U.S. Dist. LEXIS 6594, at *13 (E.D. Va. Jan. 13, 2025). Inadequate treatment or indifference to a person's medical needs is sufficient to show extraordinary and compelling circumstances. See, e.g. *United States v. D'Angelo*, 2022 U.S. Dist. LEXIS 188633, at *12 (D. Me. Oct. 17, 2022); *United States v. Almontes*, 2020 U.S. Dist. LEXIS 62524, at *6-7 (D. Conn. Apr. 9, 2020) (finding extraordinary and compelling circumstances when the BOP was indifferent to prisoner's serious spinal issue by delaying treatment and surgery for years). Importantly, Courts have not required the complete absence of medical care to find the defendant met his or her burden. Evidence that a medical condition has worsened or a prisoner's health has deteriorated despite treatment from the BOP can meet this standard. *United States v. Russell*, 757 F. Supp. 3d 1132, 1139 (D. Idaho 2024) ("Upon a review of the evidence in the record, the Court finds this is not a situation where Russell has wholly failed to receive medical care. She has received medical care. However, the Court is concerned the treatment she received has not been sufficient under the circumstances.)"

2

## II.    Mr. Preston Has Received Inadequate Medical Care

The Government derides Mr. Preston's claims that he has been treated inadequately as "conclusory assertions." ECF No. 90, at *6. But it is the Government's claims that Mr. Preston's care is being properly managed that are conclusory. Specifically, the government broadly states that his timeline of care shows the BOP's ability to treat the situation properly. In fact, the BOP has done anything but.

It is Mr. Preston's burden, and he has provided ample evidence of his deteriorating health and the mismanagement of his care. As stated in the amended motion by counsel, Mr. Preston only developed this issue while in the care of the BOP. As a doctor stated, it is "unusual to have bilateral pyelonephritis in an otherwise healthy young man with typical anatomy…" ECF No. 84, Ex. 1, at *121-122. Mr. Preston went into the BOP as a relatively healthy young man – even if he is granted release now, he is exiting with a severe, persistent health condition. Mr. Preston provided evidence of outside medical professionals, in his own BOP medical records, opining that he has received inadequate treatment: "I believe he has been incompletely treated for his initial puelonephritis." ECF No. 84, Ex. 1, at *18. Another doctor explains that "if he has had sever sub optimally treated pyelonephritis, it could have caused some scarring, and he could be left with residual chronic kidney disease." ECF No. 84, Ex. 1, at *306. The issue is clear – the BOP, despite its "lengthy" treatment of Mr. Preston, provided suboptimal care, which could (and likely has – given Mr. Preston's ongoing symptoms) cause chronic kidney disease. This is solid, clear

3

evidence that Mr. Preston's health has deteriorated directly as a result of the BOP's medical care. Chronic kidney disease cannot be reversed, only the progression of damage can be controlled and if it is not, it can lead to end-stage kidney failure, which is fatal.[1]

This alone would be enough to demonstrate Mr. Preston's extraordinary and compelling reason to be removed from the BOP. Similarly, in *Russell*, when the evidence showed that the prisoner's Menier's disease, osteoporosis, and hypothyroidism all deteriorated while in the care of the BOP, the Court found that despite receiving medical care, the deterioration of her conditions shows that such care was not sufficient. *Russell*, 757 F. Supp. 3d at 1139-1140.

However, Mr. Preston also provided evidence in his previous filing that the BOP had incorrectly stated that he had a full anesthesiology consult, which he did not – he merely had a chart review performed. How can one be put under anesthesia without the doctor ever meeting the patient, checking his vitals, or performing any sort of physical examination? Where is the plan for anesthesia? Why was it not discussed with Mr. Preston? How can he trust such a medical team to have his best interests in mind?

In government's response at ECF No. 94, they state that Mr. Preston's multiple refusals to accept care at the BOP demonstrate he should not be released. But Mr. Preston had been scheduled to a urology exam at least once

---

[1] Mayo Clinic Staff, *Chronic Kidney Disease*, MAYO CLINIC, (Sep. 6, 2023), https://www.mayoclinic.org/diseases-conditions/chronic-kidney-disease/symptoms-causes/syc-20354521.

before with an incomplete anesthesiologist consult. The BOP's care had already worsened his condition. He was rightfully scared. The BOP's nurse's notes – especially those created by practitioner Purdie, show that the staff don't care about the "why" of his refusals, merely determining, like the government, that his refusals show he does not need care. But he does. The last time he trusted the BOP with his care; they provided contraindicated medication that likely worsened his condition.

As seen in Exhibit 1 to this reply, Mr. Preston was prescribed Toradol for his pain management on February 5, 2025. Ex. 1 at *1. It is unclear from the BOP medical records (which only underscores the issues in this case) if Mr. Preston was also prescribed the same on February 3, 2025, as seen in Ex. 1 at *4-5, or if these are the same doses. He received another on February 4, 2025 (Ex. 1 at *7) in response to his complaint of pain and was told that "pain from pyelonephritis even after treatment is common but at this time he doesn't have signs of recurrent infection," a statement we now know was incorrect from Duke's medical records and other doctor's comments within his medical records. So Mr. Preston, at first trusting the medical management from BOP, was already inadvertently mishandled. He continued to receive Toradol for pain. Finally, when seen by Duke, it was advised that his acute kidney injury came from (in part) "significant dosing of Toradol," and that his medical team should "avoid heavy NSAID use moving forward." Ex 1 at *13. Despite this, he received a

Toradol shot a month later. Ex 1 at *22.[2] He was offered Toradol yet again by provider Purdie, on Jun. 2, 2025. Ex 1 at *25. At this point, he knew the issue with the medication and declined it. As Ms. Purdie writes, "When asked why patient responded 'if you don't know then I'm not going to tell you.'" *Id*. A quote such as this, taken out of the context of his whole medical saga, might be one in which the government points to in order to show Mr. Preston was denying medical care. But similarly to many of the medical records cited by the government in ECF No. 94, in context, it is perfectly understandable and reasonable why Mr. Preston did not choose to take a medicine that would only worsen his medical condition. It is not just the Duke doctors who recommend against Toradol. As seen in Exhibit 1 (at *27-32), Toradol is not recommended to those with impaired renal function, as it can worsen kidney function and cause acute kidney injury. In Mr. Preston's case, it is substantially likely it did.

It is abundantly clear that Mr. Preston's health has deteriorated under the care of the BOP and their mismanagement of his health likely caused his acute kidney injury.

Mr. Preston has also shown the suboptimal and damaging care is ongoing. In his own pro se motion (ECF No. 92), Mr. Preston has documented that in September, he told staff of pain and blood in his urine. The response was indifferent. Mr. Preston provided documentation that despite twice reporting he

---

[2] Mr. Preston is noted that he said a Toradol shot for pain made him feel better, but he is not a medical professional. At the time Mr. Preston did not have his medical records. Mr. Preston should not be responsible for telling a medical team not to provide him contraindicated medications.

had been urinating blood, on September 10, 2025, he was not called out for medical testing. The frustration of staff with Mr. Preston is evident in his pro se motion when they stated to him, "so the only thing new is the blood." Of course, he was also recommended a Toradol shot. There is absolutely no indication he was ever sent to the emergency room given this new, upsetting development. This is similar as in Beck, when the repeated delays in care, for someone with breast cancer, was seen as an extraordinary and compelling reason for release. *Beck*, 425 F. Supp. At 581.

Mr. Preston is rightfully terrified that he is not going to get the treatment he needs to reverse potential kidney failure. He has already developed acute kidney injury because of the actions of the BOP. They have provided him contraindicated medication, ignoring the dictates of medical science and the doctors at Duke. They scheduled him for a painful procedure without a proper anesthesiology consult. And now, they are ignoring his complaints of pain and blood in his urine. His health has already deteriorated. He is leaving the BOP with a condition he had not had before. It can only get worse.

### III.   The 3553 Factors Support Release

Mr. Preston has not served the majority of his time as of writing this reply. However, in December he will have served almost 3 years behind bars. He had never served any time in prison before and indeed, had no criminal history (outside a traffic offense at the age of 18) prior to the offense for which he is incarcerated. In Burr, the Court found that the 3553 factors supported release despite the prisoner

serving less than half of his sentence in part because, "The conditions of confinement have also been far more punitive than this Court envisioned at his original sentencing and when it evaluated this factor some 16 months ago. Mr. Burr has spend much of this time with 'severe and persistent' abdominal pain,' which the BOP has for the last two years failed to treat adequately." *United States v. Burr*, 2022 U.S. Dist. LEXIS 216371, *23-24 (M.D.N.C. Dec. 1,2022). So too for Mr. Preston. Since at least February of this year, Mr. Preston has been in severe pain. He is urinating blood. He is without relief or cure. While he may have served less time than originally sentenced, his time in the BOP is certainly more punitive than this Court believed would occur. And there is no excuse for medical malfeasance or negligence, even if someone is convicted of a serious crime.

While Mr. Preston's crime was serious, his history and characteristics support release. As stated above, he had criminal history prior to the offense. He has a supportive family – although he grew up poor in dangerous areas – and although not stable, he worked hard finding employment, he had a stable relationship and was a homeowner prior to being incarcerated. When he was released pre-trial, Mr. Preston complied with conditions of release and followed the Court's orders. He has since engaged in rehabilitative activities while in prison.

In short, under the 3553 factors, continued incarceration is not necessary unless looking to it from a retributive angle, however, even retributionists would agree that someone who sold drugs (even someone who carried a weapon while doing so) does not deserve to suffer a lifelong disease or medical condition. Mr. Preston now

8

carries that with him from the BOP.

## IV.    Conclusion

Given the foregoing and for the reasons stated in his amended motion for compassionate release, Mr. Preston has met his burden proving extraordinary and compelling reasons for his release and respectfully requests to be immediately released from the BOP before they further jeopardize his health and cause more harm than what has already occurred.

Respectfully submitted,

PIERRE PRESTON
By Counsel

_Beatrice Diehl_
Asst. Federal Defender
Florida State Bar No. 0124667
Assistant Federal Public Defender
Office of the Federal Public Defender
 for the Western District of Virginia
210 First Street, SW, Suite 400
Roanoke, Virginia 24011

## CM/ECF CERTIFICATE OF SERVICE

I certify that on September 30, 2025, a true copy of the foregoing was electronically filed with the clerk of the court using said court's CM/ECF electronic filing system and that to my knowledge and belief this document will be electronically sent to these individuals: the Court and counsel of record.

_Beatrice Diehl_