CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
OCT 24 2025
LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No. 4:21-CR-00015 |
| v.    ) | |
| ) | By:  Elizabeth K. Dillon |
| PIERRE RASHAD PRESTON ) | Chief United States District Judge |

**MEMORANDUM OPINION AND ORDER**

Pending before the court is defendant Pierre Rashad Preston's *pro se* "motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)." (Dkt. No. 75.) In it, he asks to be released from custody immediately. (*See id.*) The Federal Public Defender was appointed to represent Preston, and counsel filed a supplemental motion on his behalf. (Dkt. No. 81.) Preston also has filed additional motions asking for emergency hearings and emergency relief on his motion (Dkt. Nos. 88, 89), and he filed a motion to supplement those motions (Dkt. No. 92). The court has considered all his filings.

The United States opposes any reduction in Preston's sentence and opposes Preston's *pro se* motions for emergency hearings and relief. (*See generally* Dkt. Nos. 90, 94.) Preston's counsel has filed an amended reply (Dkt. No. 99), which the court also has considered.

For the reasons discussed herein, the court will grant Preston's motion to supplement, deny Preston's *pro se* and counseled motions for a sentence reduction, and deny his two emergency motions as moot.

I.  BACKGROUND

Preston was charged in a multi-count indictment and pled guilty to three counts: (1) conspiracy to distribute and to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(C) (Count 1); (2) possession with intent to distribute

and distribution of cocaine, marijuana, and methamphetamine, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(C) (Count 4); and (3) possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c) (Count 5). (Dkt. Nos. 43–45.) On January 13, 2023, this court sentenced Preston to 24 months' imprisonment on Counts 1 and 4, to be served concurrently, and 60 months' imprisonment on Count 5, to be served consecutively to the other two counts, for a total sentence of 84 months' imprisonment. This was a significant downward variance from the guideline range, which called for a total sentence of 147 to 168 months (87 to 108 months on the drug charges, to be followed by a mandatory 60-month sentence for the firearm count). It was also much lower than the 147-month sentence recommended by the United States. The court also imposed a 3-year term of supervised release on each count, to run concurrently, a fine of $300, and a special assessment of $400. (Dkt. Nos. 59, 60.)

In his motions for compassionate release, Preston explains that he has been suffering from significant illness while incarcerated. He alleges that the Bureau of Prisons (BOP) has provided him with grossly negligent medical care that has exacerbated his condition and caused him to suffer significant pain. He asks to be released so that he may receive adequate treatment from outside providers and will not have to rely on the BOP providers, whom he does not trust.

The United States argues that neither Preston's medical condition nor the allegedly negligent care is an "extraordinary and compelling" reason rendering him eligible for a reduced sentence. It further contends that the 18 U.S.C. § 3553(a) factors do not support his immediate release or a reduction in sentence.

The parties have provided the court with voluminous medical records, and each has highlighted the portions that they believe are most relevant. For purposes of this opinion, it is

not necessary to describe in detail the course of Preston's medical treatment. Instead, the court provides a basic overview here, emphasizing the portions of his treatment that Preston has deemed insufficient or most problematic.

Preston was first diagnosed with pyelonephritis (a kidney infection)[1] in January 2025, while housed at FCC Butner.[2] At the time, he was 39 years old; he turned 40 in May. His symptoms included pain in his right flank, pain when urinating, vomiting, and frequent pain "shooting down" into his testicles. Eventually, he was diagnosed with bilateral pyelonephritis and an acute kidney injury (AKI). (Reply Ex. 1, at 11, Dkt. No. 96-1.) A BOP physician noted on February 6 that it was "[u]nusual to have bilateral pyelonephritis in an otherwise healthy young man." (*Id.* at 15.) In February 2025, Preston was twice transferred to Duke Regional Hospital (Duke) for care and treatment. The discharge summary from his first visit recommended a urology consult as well as certain lab work. (*Id.* at 11.)

On February 24, 2025, a different Duke physician signed a discharge summary after Preston's second hospitalization. (*See* Am. Mot. Ex. 1, at 283–89 (this sealed exhibit is on a thumb drive on file with the Clerk).) He again recommended "outpatient follow-up with urologist" and "outpatient cystoscopy," (*id.* at 283), a procedure during which a thin tube connected to a camera is inserted into the urethra.[3] In addition to recommending follow-up and that test, an infectious disease physician stated in a note from that hospitalization, "I believe he

---

[1] Preston's amended motion describes his medical conditions, and the government does not generally contest the accuracy of those descriptions. (*See* Am. Mot. 4–5 & n.1, Dkt. No. 81 (citing *Kidney Infection (Pyelonephritis),* and Urology Care Foundation, https://www.urologyhealth.org/urology-a-z/k/kidney-infection-(pyelonephritis)).)

[2] Throughout this opinion, the court utilizes the term Butner to refer to any of the federal facilities at the Butner Federal Correctional Complex, including the Federal Medical Center.

[3] *Cystoscopy*, American Cancer Society, https://www.cancer.org/cancer/diagnosis-staging/tests/endoscopy/cystoscopy.html), cited in Am. Mot. 3 n.3. The procedure may help to identify causes of symptoms such as blood in the urine or to biopsy any abnormal areas. *Id.*

has been incompletely treated for his initial pyelonephritis." (*Id.* at 295.) The same note also recommended follow-up treatment at Duke.

According to his counseled motion, Preston went to the emergency room at least six times in 2025, including the two February visits, but medical personnel still have not determined why his kidney health is so "rapidly deteriorating." (Am. Mot. 5, Dkt. No. 81.) In a March 3, 2025 note, a consulting physician described the course of his illness to that date. (Am. Mot. Ex. 1, at 306.) That doctor noted that he was "still hopeful for improvement in renal function given his lack of other risk factors, although if he has had severe sub-optimally treated pyelonephritis, it could have caused some scarring, and he could be left with residual chronic kidney disease." (*Id.*) This note and others offer some evidence that a lack of timely or proper treatment may have contributed to further injury to Preston's kidneys or an exacerbation of his condition. There also is no dispute that Preston continues to report significant pain, as recently as September.

Between March and September, Preston had numerous visits to the medical department at Butner, including multiple seeing a urologist. He also was hospitalized additional times. He has not yet had a cystoscopy and does not dispute that he was offered and refused one, but he offers explanations for that refusal, as discussed below. The records also reflect that he received an MRI in mid-August, with findings showing a stable "benign lipid rich adrenal adenoma" on the right kidney. (U.S. Resp. to Emergency Mtns. Ex. A, at 3, Dkt. No. 94-1.) Because it was "benign and stable," the medical notes state that "no immediate intervention is needed and a one-year follow-up CT scan was ordered." (*Id.* at 6.)

There are three primary aspects of his medical treatment that Preston argues are deficient. First, Preston points out that providers at Butner repeatedly gave him Toradol, an NSAID, for pain, even though it was contraindicated for his condition. (*See* Am. Reply Ex. 1, at 4–5, 7, 9–10

4

(BOP encounter notes appearing to reference Toradol being given on February 3, 4, and February 5).[4]) Indeed, even a BOP provider apparently directed that after he ordered a final dose of Toradol on February 4, Preston should not receive any NSAIDs. (*Id.* at 7.)

During his early February hospital stay at Duke (from February 5 to 9), Preston was diagnosed with bilateral pyelonephritis and acute kidney injury. The discharge notes also state that "nephrology was consulted" and thought his high creatin levels were "in the setting of infection as well as significant dosing of Toradol," and the discharging physician expressly directed that he should "[a]void heavy NSAID use moving forward." (Am. Reply Ex. 1, at 13.) Thus, not only has Preston submitted information in his reply that Toradol generally is contra-indicated for persons with kidney infections or injuries (*id.* at 27–32), but one of his Duke physicians specifically directed that he should avoid using it. (*Id.* at 13.) Despite this, after that information was conveyed to the BOP staff, Preston was given Toradol once in March and was offered it—but refused it—once in June. (*Id.* at 21–22, 25.)

The second aspect of his care that Preston highlights is the delays in seeing a urologist and in getting a cystoscopy, as recommended by the physicians at Duke in February. The United States attributes these delays to Preston's own "refusals." Preston insists, though, that he kept requesting treatment, but admits that he agreed to be seen only by an outside urologist because he did not trust the medical providers at Butner. In early March, a urology consult with a Butner urologist was scheduled at some point for late April, but Preston insisted on going to a Duke urologist and refused a BOP consult, so that consult was cancelled. (Am. Mot. Ex. 1, at 43, 57, 59, 65–67, 188.) A consult was again ordered in May for early June. (*Id.* at 17, 20, 23, 187, 263.) Preston was finally seen by urology on June 18 and started on tamsulosin (*Id.* at 6, 249.)

---

[4] It appears from his Butner medical records that he was given doses of Toradol on all three dates, but a separate medication log reflects only one dose, February 5. (*Compare* Am. Reply Ex. 1, at 4–5, 7-10 *with id.* at 1–2.)

5

He alleges that these delays have likely harmed him.

Preston further emphasizes that the cystoscopy (which was apparently scheduled and cancelled on at least one occasion in June), was cancelled both because the Butner medical staff had not yet consulted an anesthesiologist and because they had not yet taken him to see a urologist.[5] It was rescheduled for July 2025 at some point. The United States points out that the medical records state that anesthesia and an airway assessment would occur on the day of the procedure, but Preston states that he was never advised of this fact. Regardless, his medical records reflect multiple times when Preston refused the procedure and signed a form so stating, again because he wanted it to be performed at Duke. (Opp'n to Emergency Mtns. Ex. A, at 1 (declining on September 9, 2025, declining on August 1, 2025).) Thus, it appears that the BOP has been willing to provide this procedure, but Preston has repeatedly refused it.

Third, Preston complains that, despite consistent, significant pain for months, he has not been given adequate treatment for his pain nor have the doctors been able to fully determine its cause. Indeed, he recently reported blood in his urine—a new concerning symptom given his history of kidney injury—but he alleges that no action was taken in response to that report.

## II. DISCUSSION

**A. Compassionate Release Under the First Step Act**

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence under certain circumstances. As

---

[5] Preston also complains that the BOP at one point stated that he had been evaluated by an anesthesiologist, but the anesthesiologist had merely reviewed his chart and had not met with him in person or physically evaluated him.

amended by the First Step Act and in pertinent part,[6] the statute

> authorizes a court, in its discretion, to reduce a term of imprisonment after it has (1) considered the [18 U.S.C.] § 3553(a) factors for imposing a sentence, (2) found that "extraordinary and compelling reasons warrant such a reduction," and (3) found that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

*United States v. Crawley*, 140 F.4th 165, 169 (4th Cir. 2025) (quoting 18 U.S.C. § 3582(c)(1)(A)); *United States v. Centeno-Morales*, 90 F.4th 274, 279 (4th Cir. 2024). In 2023, the Commission issued an amended policy statement setting forth a non-exhaustive list of circumstances that may individually or in combination constitute "extraordinary and compelling" reasons for a sentence reduction. *See* U.S.S.G. § 1B1.13. That policy statement governs Preston's motion. *See Crawley*, 140 F.4th at 170.

The defendant bears the burden of showing that extraordinary and compelling reasons exist. *See United States v. Hargrove,* 30 F.4th 189, 195 (4th Cir. 2022) (noting that the inmate provided information "to carry his burden of demonstrating that his medical conditions served as an extraordinary and compelling reason for release"). And "[a] movant for compassionate release bears the burden of showing why the § 3553(a) factors justify a modified sentence." *Centeno-Morales*, 90 F.4th at 279.

**B. Exhaustion**

Section 3582(c) also requires administrative exhaustion before a defendant may file a motion requesting relief under it, although that requirement is a "'non-jurisdictional claim-processing rule' that can be waived or forfeited if not timely raised." *United States v. Davis*, 99 F.4th 647, 653 n.2 (4th Cir. 2024) (quoting *United States v. Muhammad*, 16 F.4th 126, 130 (4th

---

[6] Prior to the First Step Act of 2018, only the BOP could seek relief in court under the statute. The First Step Act changed the statute to allow a federal inmate to file a motion for compassionate release directly with the court after exhausting his administrative remedies.

Cir. 2021)). Specifically, a defendant must request that the BOP bring a motion on his behalf and then either "fully appeal" the BOP's failure to do so or allow 30 days to lapse without a response. § 3582(c)(1)(A).

Preston asserts that he has properly exhausted his administrative remedies, and the United States concedes the same. (Opp'n 3, Dkt. No. 90.) Thus, the court finds he has satisfied this requirement.

## C. Extraordinary and Compelling Reasons

As noted, Preston's compassionate release motion is premised entirely on his illness and the allegedly faulty medical care he has received while in BOP custody. Claims that the Bureau of Prisons or its medical personnel are providing grossly inadequate medical care may have a remedy in an appropriate civil action, such as a Federal Tort Claims Act lawsuit or a *Bivens* action.[7] Such allegations also may give rise to state-law tort claims. And it may be possible for Preston to obtain preliminary injunctive relief through one of those avenues. But those types of claims are not properly brought in this court; Preston is incarcerated in North Carolina, not within the Western District of Virginia, and there is no indication of any connection between this district and his claims or any of the potential defendants.[8]

To the extent such allegations can serve as the basis for a reduced sentence, Preston is

---

[7] The court recognizes the limited availability of any *Bivens*-type remedy. *See Goldey v. Field*, 606 U.S. 942, 944–45 (2025) (noting the narrowing of such causes of action and summarizing that the Supreme Court had consistently declined to extend *Bivens* to new contexts "[f]or the past 45 years"). Preston likens his case to *Carlson v. Green*, 446 U.S. 14 (1980)—one of the cases in which the Court previously recognized a *Bivens* remedy—in which "a prisoner's estate sued federal jailers for failing to treat the prisoner's asthma." *Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017). The issue of whether this case arises in a different context than *Carlson* is not before this court.

[8] During a status conference held on September 29, 2025, Preston's appointed counsel indicated that Preston had filed at least one civil action in either a state or federal North Carolina court. She further noted that she does not represent him in that action. The court was able to find two pending cases filed by Preston in the United States District Court for the Eastern District of North Carolina, but neither involves his medical treatment nor asserts claims based on his medical treatment. They are: (1) *Preston v. Warden*, Case No. 5:25-hc-2095-FL, which is a petition for habeas corpus under 28 U.S.C. § 2241 and does not raise any medical concerns; and (2) *Preston v. McCrae*, Case No. 5:25-cr-032470D, filed on October 16, 2025, which asserts claims related to Butner staff allegedly opening his privileged mail outside of his presence.

required to show that these alleged failures of medical care are "extraordinary and compelling" circumstances and that a reduced sentence is appropriate after consideration of the § 3553(a) factors.

The United States Sentencing Commission has issued a policy statement addressing motions for sentence reduction under 18 U.S.C. § 3582(c)(1)(A). *See* U.S.S.G. § 1B1.13. With regard to medical circumstances, an extraordinary and compelling reason for a sentence reduction exists when:

> (A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (B) The defendant is—
>
>> (i) suffering from a serious physical or medical condition,
>>
>> (ii) suffering from a serious functional or cognitive impairment, or
>>
>> (iii) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

U.S.S.G. § 1B1.13(b)(1)(A)–(C).

As far as the court can tell, Preston seeks relief under subsection (C).[9] In particular, he

---

[9] Based on the current record, the court cannot find that Preston could satisfy subsections (b)(1)(A) or (B), either, if he were seeking relief under them. As to (b)(1)(A)—and despite Preston's assertion in his motions for

9

argues that his condition requires specialized care "that is not being provided and without which he is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(C). In his amended reply, he also emphasizes that the court is "empowered to consider any reason" he may give, even if it does not "neatly fit into the strict scriptures of the guidelines' box." (Am. Reply 2.) This appears to be an invitation for the court to consider the guideline provision that says extraordinary and compelling reasons can be based on "any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4) are similar in gravity to those described in paragraphs (1) through (4)." U.S.S.G. § 1B1.13(b)(5).

Regarding (b)(1)(C), Preston has certainly shown that he has a medical condition and it may well require "specialized" care. As to whether that care is being provided, the United States takes the position that, to the extent his kidney problems require specialized care, such care is being provided. When it is not provided, the government argues, it is only because Preston himself is refusing such care.

As noted, Preston contends that, given the mistakes BOP medical staff has made, he is reluctant to allow a surgical procedure or to take medical advice from them. Preston's reasons for not accepting that care may well be understandable, but that does not mean care is not being offered or provided. Moreover, it is unclear whether a failure to have a cystoscopy or a failure to provide additional treatment for his ongoing pain, place Preston "at risk of serious deterioration in health or death."

Preston cites to other cases to support his assertion that the BOP's conduct is sufficient to

---

emergency relief that he might die from his kidney problems—no physician has opined that he has a "terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory)." Similarly, as to (b)(1)(B), he has not shown that his kidney injuries or infection, or even his continuing pain, have "substantially diminishe[d]" his ability "to provide self-care within the environment of a correctional facility" or that he "is not expected to recover" from that condition.

show a valid reason for release. One is *United States v. Beck*, 425 F. Supp. 3d 573 (M.D.N.C. 2019), where the court found that the BOP's gross mismanagement of the medical care for the defendant's invasive breast cancer qualified as an extraordinary and compelling reason for release. The *Beck* court noted that repeated delays, which "prevented her from timely obtaining urgent tests and treatment," resulted in the spread of the cancer to Beck's lymph nodes and possibly to her other breast. There was expert testimony in the case from an oncologist who testified that delays of the sort caused by BOP "compromise both recurrence free survival and overall survival." *Id.* at 576. There, the defendant was sentenced to 165 months' imprisonment for drug and firearms offenses and had served approximately 76 months (or about 46% of the imposed sentence) at the time that her sentence was reduced to time served. *Id.* at 575.

Certainly, there have been some delays in Preston's care, as well as the troubling use of a medication that physicians at Duke and within the BOP had directed not be used or used only sparingly. But Preston's case differs from the circumstances in *Beck*. First, *Beck* was entered before the Guidelines Policy Statement was issued, providing clearer guidance on when medical circumstances render a defendant eligible for relief. Second, in *Beck*, the court pointed to a medical standard of care saying that a biopsy should be performed within two months after the detection of an abnormality. Despite that, the BOP waited eight months and failed to heed the recommendations of multiple doctors over the course of that eight months, all of whom said Beck needed a biopsy. Here, Preston's medical records indicate that the BOP complied with the recommendation of a referral to urology and that the cystoscopy had been offered and declined by Preston, although perhaps for valid reasons. Furthermore, while Preston is displeased with the care (or lack thereof) he has received at Butner, he has been seen in Butner's urology

11

department, he has been taken to the hospital multiple times over the course of a year, and he has had an MRI and multiple CT scans, blood work, etc.

Additionally, in *Beck*, there was expert testimony from a related civil case in which a physician closely tied the delays to the poor patient outcome. By contrast, and although one of the Duke doctors suggest that Preston's initial kidney infection was undertreated, he has not pointed the court to any evidence in which a physician has blamed any long-term poor outcome on delayed treatment by the BOP. In some ways, then, the factual circumstances are more akin to other cases where courts have not found a compelling reason for a sentence reduction. *See, e.g.*, *United States v. Young*, No. 4:18CR00017, 2024 WL 1653773, at *2 (W.D. Va. Apr. 17, 2024) (denying compassionate release for lack of extraordinary and compelling reasons where defendant had alleged a variety of mental and physical health disorders and there had been some delays in obtaining medical treatment, but his medical records reflect that he was repeatedly provided access to doctors and medical treatment); *United States v. Freeman*, 617 F. Supp. 3d 386, 397 (E.D. Va. 2022) ("[C]hronic conditions that can be managed in prison . . . are not a sufficient basis for compassionate release.") (citations omitted).

Nonetheless, the court recognizes that Preston has been ill enough to be hospitalized repeatedly and that he continues to complain of pain that he says is not being adequately treated. To be sure, outcomes in medicine are not always what one hopes for and sometimes answers are difficult to obtain. But Preston has shown that he was given contra-indicated medicine against discharge instructions, not promptly scheduled for a test his outside doctors recommended (or not given the proper consultations so that the test could promptly occur),[10] and that his pain is not being adequately treated. Considering those facts, the court will assume, without deciding,

---

[10] As noted, however, there is evidence that Preston has refused that test and has sometimes refused to see an in-house urologist.

that Preston could establish extraordinary and compelling circumstances to render him eligible for a reduced sentence.

Even assuming his circumstances are "extraordinary and compelling," however, the court will not grant any relief because the § 3553(a) factors do not support his release.

**D.  Section 3553(a) Factors**

When determining whether a sentencing reduction is warranted, the court must consider any applicable sentencing factors under 18 U.S.C. § 3553.  Those factors include:

- the nature and circumstances of the offenses;
- the history and characteristics of the defendant;
- the need for the sentence imposed to reflect the seriousness of the offenses, to promote respect for the law, to provide just punishment for the offenses, to deter criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational, vocational and other correctional treatment services;
- the kinds of sentences available and the sentencing range for the offenses; and
- the need to avoid unwarranted sentence disparities.

18 U.S.C. § 3553(a).

The nature and circumstances of the offenses are not favorable, particularly in that Preston possessed firearms while selling drugs, which increases the risk of harm to all those involved or unlucky enough to be in the area.  He also served as a middleman in a drug conspiracy and was involved for approximately one year.  This was not short-term or minimal involvement.  In all respects, the nature and the circumstances of the offense weigh against allowing him to be released after serving only about one-third of his sentence.  (*See* Opp'n 2 (noting that, as of September 24, 2025, Preston had served approximately 34% of his 84-month sentence).)

Preston's history and characteristics are mixed.  He was only a criminal history category I at sentencing, and he had no history of violence.  But his lack of any significant criminal

13

history—and lack of any history of violence—was part of the reason that the court varied downward to a sentence far below the advisory guideline range of 87 to 107 months, *plus* 60 months. (Statement of Reasons 5, Dkt. No. 61.) The court also took into account Preston's ties to the community, stable employment history, and supportive family as grounds for varying downward. (*Id.*) So, those factors—while they remain in his favor—already were considered by the court when giving him a below-guidelines sentence.

It may well be, as many of the supporting letters from his family members state, that Preston no longer poses any danger to the public. (Dkt. Nos. 81-12 (letters from family).) The court acknowledges, too, his assertions of both a positive disciplinary record and his rehabilitation efforts. And the court recognizes that having to serve a sentence while experiencing significant pain and illness results in a harsher sentence than the sentence would otherwise be. But other factors, including the need to punish, for general deterrence, and especially the need to avoid unwarranted sentencing disparities—weigh against allowing him to be released after having served less about 35% of his sentence, which was *significantly* below the applicable guideline range.

For these reasons, the court declines to reduce Preston's sentence. The court emphasizes, however, that this ruling does not prevent Preston from reconsidering his willingness to receive medical care from providers at Butner (including a cystoscopy), nor does it affect his ability to bring any civil lawsuit or seek injunctive relief through such lawsuit. *See supra* at 8.

### III. CONCLUSION AND ORDER

For the reasons stated above, it is hereby ORDERED that:

1. Preston's motion to supplement (Dkt. No. 92) is GRANTED, and the court has considered the supplemental information he provided;

14

2. Preston's pro se and amended motions for a reduced sentence (Dkt. Nos. 75, 81) are DENIED; and

3. Because the court has now resolved his motions for a reduced sentence, Preston's motions for emergency relief and for an immediate hearing (Dkt. Nos. 88, 89) are DENIED AS MOOT.

The clerk is directed to provide a copy of this order to all counsel of record and directly to Preston.

Entered: October 24, 2025.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
Chief United States District Judge